UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 12-35492 |
| | ) | |
| GABRIELA CARTER, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| GABRIELA CARTER, | ) | Adversary Case No. 12-01889 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SALLIE MAE, ILLINOIS STUDENT ASSISTANCE COMMISSION, U.S. DEPARTMENT OF EDUCATION, and EDUCATIONAL CREDIT MANAGEMENT CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Gabriela Carter (the "Debtor") filed for chapter 7 bankruptcy relief and, through this adversary proceeding, now seeks to discharge her educational loan debt owed to the Illinois Student Assistance Commission ("ISAC") and Educational Credit Management Corporation ("ECMC") under 11 U.S.C. § 523(a)(8).[1] For the reasons that follow, the Court finds that the Debtor has failed

---

[1] In her adversary complaint, filed on December 13, 2012, the Debtor named as defendants Sallie Mae, ISAC, and the U.S. Department of Education (the "ED"). Of the student loans described in the complaint, the Debtor was indebted to Sallie Mae pursuant to the terms of a Signature Student Loan Promissory Note for a loan disbursed on July 27, 2005 (the "Signature Loan"). Sallie Mae was also the servicer of seven Federal Family Education Loan Program guaranteed student loans, but those loans were assigned to ECMC for litigation. Accordingly, on January 22, 2013, ECMC moved to intervene as the proper party defendant for Sallie Mae with respect to those seven loans; the Court granted ECMC's motion to intervene on February 19, 2013. As for the Signature Loan, based on the stipulation of Sallie

to demonstrate that repayment of the loans would constitute an "undue hardship" pursuant to the statutory exception. Accordingly, the Court finds in favor of ISAC and ECMC (collectively, the "Defendants") and against the Debtor and holds that the student loan debt is nondischargeable under § 523(a)(8).

## JURISDICTION

The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is properly placed in this Court pursuant to 28 U.S.C. § 1409(a).

## FACTS AND BACKGROUND

On September 7, 2012, the Debtor filed a voluntary petition for relief under chapter 7. Thereafter, on November 7, 2012, the trustee filed a no-asset report. Before she received a discharge and the bankruptcy case was subsequently closed, the Debtor filed an adversary proceeding on December 13, 2012, seeking to discharge her student loan debt. The Debtor appeared pro se in both the bankruptcy case and the adversary proceeding.[2] In the latter, she alleged that her

---

Mae and the Debtor, the Court entered an order on February 22, 2013, determining that the balance due on that loan is dischargeable and dismissing Sallie Mae as a defendant in the adversary proceeding. Finally, with respect to the U.S. Department of Education, the Court entered an order on February 5, 2013, dismissing the adversary complaint as to the ED based on an agreement between the ED and the Debtor. Thus, the remaining defendants in this adversary proceeding are ISAC and ECMC.

[2] Determining that the Debtor qualified for and would benefit from representation, on August 20, 2013, the Court requested the appointment of counsel for the Debtor from its Volunteer Attorney Panel. Subsequently, the appointed attorneys–from the law firm of Latham & Watkins, LLP–filed their appearances, and on September 27, 2013, they filed an amended complaint. About a month later, on November 1, 2013, the attorneys filed leave to withdraw as counsel, citing "fundamental disagreements" between them and the Debtor and indicating the Debtor's desire to terminate the representation. The Court granted the attorneys' motion to withdraw on November 12, 2013. Thus, the Debtor represented herself in a pro se capacity for the remainder of the adversary proceeding.

educational loan debt should be discharged on the grounds of undue hardship pursuant to § 523(a)(8). An evidentiary hearing was held before the Court on February 25, 2014. The following facts are taken from the Debtor's complaint,[3] the answers filed by ISAC and ECMC, other relevant pleadings filed by the parties, the Court's docket, and the testimony and evidence presented and admitted at the hearing.

The Debtor was born and raised in Czechoslovakia and has been living in the United States since 2000. (Trial Tr. 46:16-21.) At the time of trial, she was a 52-year-old single mother of one child–a daughter, aged 18.[4] (Pretrial Statement ¶ 4.) The Debtor resides in the city of Chicago. (*Id.*) Her daughter is a college student living at the University of Michigan in Ann Arbor. (Trial Tr. 29:13-30:5.) Although the Debtor continues to provide her daughter with financial support by purchasing her food, clothing, and other necessities, the college costs are being covered by a scholarship and a student loan made in her daughter's name. (Trial Tr. 29:18-30:16; Compl. ¶ 7.)

As to her own education, the Debtor earned a master's degree in chemistry through the Czechoslovakian educational system prior to coming to the United States. (Trial Tr. 112:17-24.) Subsequently, she completed an Office Occupations Training Program at Seattle Vocational Institute in Seattle, Washington, in July 2001, and a Pharmacy Technician Program at Black Hawk College in Moline, Illinois, in May 2002. (Defs. Ex. No. 1.) The Debtor was certified as a pharmacy

---

[3] During a status hearing on December 3, 2013, counsel for ISAC expressed his concerns about the amended complaint filed by the Latham & Watkins attorneys, noting that it was "wholly undocumented" and "argumentative." In response, the Debtor withdrew the amended complaint in open court and agreed to move forward on the complaint that was originally filed on December 13, 2012. It is that complaint from which the Court draws its facts, along with the other documents and testimony referred to above.

[4] Although the Pretrial Statement asserts that the Debtor was fifty-two years old at the time of trial, the Debtor testified that she was born in 1961 and was fifty-three. (Trial Tr. 42:21-25, 43:21-22, 54:15-19.)

3

technician in July 2002 and a national pharmaceutical representative in March 2006. (*Id.*) Seeking a career change, she decided to go to DeVry University's Keller Graduate School of Management, where she earned a Master of Business Administration, with a concentration in business management and sales, in September 2007. (Pretrial Statement ¶ 5; Defs. Ex. No. 1; Trial Tr. 114:23-115:15, 128:19-22.)

The Debtor's work history substantially corresponds to her educational background. She was employed as a certified hospital pharmacy technician, first at Kewanee Hospital in Kewanee, Illinois, from March 2002 to May 2003, and then at Resurrection Health Care in Chicago from July 2003 to March 2005. (Defs. Ex. No. 1.) Subsequently, from August 2005 to June 2008, the Debtor was a certified pharmacy technician instructor at Corinthian Colleges in Chicago. (*Id.*) In that capacity, she presented course material, met with students during office hours, completed paperwork, and participated in instructor training. (*Id.*) Although she was perceived as organized and professional, with a good knowledge of the material she was teaching, she tended to get angry and frustrated, and she yelled at her students. (Debtor Ex. No. 6.) As a result, she was fired in June 2008. (Trial Tr. 37:7-20.)

After earning her MBA from Keller, the Debtor did brief stints–for two months at a time–as a sales associate at Macy's in 2010 and a customer service associate in an alderman's office in 2011. (Defs. Ex. No. 1.) More recently, from June 2011 to December 2012, she was employed as a service clerk at a Walgreens store in Chicago, greeting and interacting with customers and processing their purchases. (*Id.*; Trial Tr. 113:7-11.) She was fired from that job after receiving numerous disciplinary warnings for, among other things, poor customer service, failing to follow company procedures, and getting into a verbal altercation with another employee. (Debtor Ex. Nos. 4 & 5.)

Since 2013, the Debtor has had a part-time job at the St. Paul United Church of Christ in Chicago, where she provides childcare every Sunday while services are in session. (Trial Tr. 31:7-32:4.) She testified that she has tried to find full-time employment but has been unable to do so, primarily because she has an "argumentative personality" that prevents her from working well with others, employers do not find her likable, and English is not her first language. (Trial Tr. 40:2-22, 114:6-14, 116:15-118:21; Compl. ¶ 7.)

In 2013, the Debtor's gross income from her part-time job at the church, unemployment income, and some sort of unspecified self-employment totaled $12,925.[5] (Pretrial Statement ¶ 18; Trial Tr. 32:10-33:2.) Prior to that, the Debtor earned $18,975 in 2012 and $11,275 in 2011. (Debtor Ex. No. 3.)

The Debtor testified that her monthly expenses are as follows: $925 for rent, $365 for food, $76 for phone and utilities, $44 for clothing, $45 for laundry, and $30 for personal maintenance. (Trial Tr. 18:21-20:14, 22:20-24:20, 25:16-25; Compl. ¶ 6.) The Debtor pays only $5 a month for transportation because she walks everywhere she needs to go. (Trial Tr. 25:12-16.) She no longer has a monthly Internet charge of $25, as she cancelled that service in January 2014. (Trial Tr. 23:15-20; Compl. ¶ 6.) Additionally, in February 2014, she finished paying for dental expenses, which had been $63 per month. (Trial Tr. 24:20-25:9, 80:17-22.) And she no longer pays a $275 fee to the Lincoln Park Boat Club for her daughter's rowing activities. (Trial Tr. 26:8-24.) The Debtor owes more than $4,000 in back rent. (Trial Tr. 24:2-9.) She no longer owns a car, as she sold her 2003 Mitsubishi Galant for $5,000 in August 2007 in order to pay living expenses. (Trial Tr. 34:23-35:8,

---

[5] The Debtor stopped receiving unemployment compensation at the end of 2013. (Trial. Tr. 17:9-18:15; Debtor Ex. No. 1.)

5

59:11-14; Debtor Ex. No. 11.) She has no health insurance, no retirement plan, and no savings. (Trial Tr. 27:15-18, 34:19-22.)

To finance her education at Keller, the Debtor took out ten student loans. ISAC is the holder or guarantor of three of those loans, which total $18,500. (Pretrial Statement ¶ 11.) ECMC is the holder or guarantor of the remaining seven loans on which the Debtor owes $53,200. (Pretrial Statement ¶ 13.) The total principal balance on all ten loans is $71,700. (Pretrial Statement ¶ 15.)

Although the details are a bit unclear as to repayment activity, the testimony suggests that the Debtor consolidated her student loans in 2008 and subsequently sought both deferments and forbearances of the loans. (Trial Tr. 60:9-62:12.) Those requests were denied. (Trial Tr. 62:13-14.) In May 2012, the Debtor was notified that the ISAC loans had gone into default. (Trial Tr. 61:5-8.) During the period July 2012 through September 2012, the Debtor made five payments on the loans to ISAC–through wage garnishment–in the total amount of $211.54. (Trial Tr. 81:20-82:1; Debtor Ex. No. 10.) On the ECMC loans, she made total payments of $46.43. (Pretrial Statement ¶ 14.) After the Debtor filed for bankruptcy, counsel for ISAC informed her on numerous occasions of various options for relief from the student loan debt, including an income-contingent repayment program which, based on her income, would not require her to make any payments on the loans. (Trial Tr. 84:10-89:17.) The Debtor rejected the suggested alternatives to discharge and, in particular, declined to participate in an income-based program, because she feared that such participation would result in a tax event at some point in the future. (Trial Tr. 86:9-23, 89:2-17, 92:22-93:12.)

## DISCUSSION

The Debtor now seeks to have the student loan debt discharged pursuant to § 523(a)(8).

Under that statutory exception, debtors cannot discharge student loans in bankruptcy unless they show that paying the loans would cause "undue hardship":

(a)   A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

\* \* \*

(8)   unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –

(A)(i)   an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii)   an obligation to repay funds received as an educational benefit, scholarship or stipend; or

(B)   any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8). Section 523(a)(8) aims to curb abuse by debtors who, having obtained their education, seek to evade their obligation to pay for it by getting discharge of their student loans. *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003); *Larson v. United States (In re Larson)*, 426 B.R. 782, 794 (Bankr. N.D. Ill. 2010). The purpose of the statute is also to protect the solvency of the educational loan program while maintaining the Bankruptcy Code's overall goal of providing a fresh start for the honest but unfortunate debtor. *See Larson*, 426 B.R. at 794.

The Code does not define "undue hardship," but the Seventh Circuit has adopted a strict and narrow interpretation of the Second Circuit's three-pronged "*Brunner* test" for evaluating such a claim. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner v. N.Y. State Higher*

*Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)). Under the *Brunner* test, the Debtor must establish that: (1) she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loans; (2) additional circumstances exist demonstrating that the state of affairs is likely to persist for a significant portion of the repayment period of the loans; and (3) the Debtor has made good-faith efforts to repay the loans. *Id.*; *see also Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 883 (7th Cir. 2013). The Debtor bears the burden of proving each element of the three-part test by a preponderance of the evidence. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). If she fails to demonstrate any one of the elements, the test has not been satisfied, and the Court need not continue with the inquiry. *Id.*

The first prong of the *Brunner* test requires an analysis of the Debtor's "current financial condition" to determine if payment of the student loans would cause her standard of living to fall below that which is "minimally necessary." *Roberson*, 999 F.2d at 1135; *Barker v. Educ. Credit Mgmt. Corp.*, No. 07-CV-0224-MJR, 2008 WL 754095, at *5 (S.D. Ill. Mar. 18, 2008). This "bare minimum" requirement to assert a claim of undue hardship is a common-sense examination that is typically based on "concrete" and "readily obtainable" information. *Id.* Debtors need not live in "abject poverty" to satisfy the first prong but "are expected to live within the strictures of a frugal budget for the foreseeable future." *Clark v. U.S. Dep't of Educ. (In re Clark)*, 341 B.R. 238, 249 (Bankr. N.D. Ill. 2006) (internal quotation omitted).

Given her income and expenses at the time of trial, the Debtor appears to be unable to repay her student loans while maintaining a minimal standard of living for herself and her daughter. For 2013, the Debtor made $2,805 less than the $15,730 per year that sets the federal poverty guidelines

for a family of two. *See* 79 Fed. Reg. 3593 (Jan. 22, 2014). Her monthly expenses, as detailed above, are all necessary for a basic standard of living and demonstrate a budget that is not only frugal but leaves no room for unexpected outlays. In fact, even without making payments on the loans, the Debtor is unable to break even each month.[6] She has no car, no savings, no medical insurance, no retirement plan, and no additional funds with which to pay her monthly bills.

At trial, the Defendants did not seriously suggest that the Debtor can make any meaningful payment on her student loans. Nor did they argue that any line item in the Debtor's monthly budget is unreasonable or overstated. Rather, ECMC asserted that under an income-contingent repayment plan, the Debtor would not be required to make any payments on the loans. Thus, according to ECMC, it would not be the repayment of the loans that would cause the Debtor to fall below a minimum standard of living. The Court rejects this argument as specious and disingenuous. Whether forced to repay the student loans or not, the evidence regarding the Debtor's income and expenses clearly establishes a standard of living below that which is "minimally necessary." Accordingly, the Debtor has met her burden of proof as to the first prong of the *Brunner* test.

Turning to the second prong, the Court must examine whether additional circumstances exist indicating that the Debtor's state of affairs is likely to persist for a significant portion of the repayment period. *Goulet*, 284 F.3d at 778; *Roberson*, 999 F.2d at 1135. The Seventh Circuit has held that the dischargeability of student loan debt should be based on a "'*certainty of hopelessness*, not simply a present inability to fulfill financial commitment.'" *Goulet*, 284 F.3d at 778 (quoting *Roberson*, 999 F.2d at 1135-36). "Certainty of hopelessness" is a difficult standard that can

---

[6] The Debtor's gross income for 2013 was $12,925, which amounts to $1,077.08 per month. Subtracting the monthly expenses of $1,490 about which the Debtor testified at trial leaves a shortfall of $412.92 per month.

9

generally be met only by debtors whose repayment periods have already run–making their inability to pay for the entire period a matter of fact rather than speculation–or debtors who are severely disabled, have psychiatric problems, lack usable job skills, or have very limited education. *Id.* at 778; *Larson*, 426 B.R. at 795; *Simmons v. U.S. Dep't of Educ. (In re Simmons)*, 334 B.R. 632, 636 (Bankr. C.D. Ill. 2005), *aff'd*, No. 06-3012, 2006 WL 2556581 (C.D. Ill. Aug. 31, 2006). To satisfy this standard, a debtor must present evidence not only of current inability to pay but also "'of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time.'" *Goulet*, 284 F.3d at 778 (quoting *Roberson*). Such evidence "more reliably guarantees that the hardship presented is 'undue.'" *Roberson*, 999 F.2d at 1136 (internal quotation omitted).

Here, the Debtor has failed to present evidence of insurmountable circumstances making her unable to pay her student loan debt for the remainder of the payment period.[7] Having earned two master's degrees, completed college-level training programs, and acquired various professional certifications, the Debtor has substantial education. And, although she has had some difficulty maintaining employment in the past, her resume reveals an extensive and diverse work history.

Despite her credentials and past work experience, the Debtor cites her age, her limited vocabulary, her "argumentative personality," and the fact that she is unlikable as barriers to her ability to find full-time employment and thus repay her student loans. She also testified as to some previous medical issues that could possibly affect her ability to work in the future. None of these circumstances appears exceptional or indomitable, and therefore they do not meet the "certainty of

---

[7] No evidence was presented at trial as to the remaining payment period for the Debtor's student loans. Because the Debtor earned her MBA just over seven years ago, however, the Court presumes that the initial repayment period has not yet run.

hopelessness" standard required by the second *Brunner* prong.

First, the Debtor contends that there are no job or advancement opportunities available to her because of her age. (Trial Tr. 42:21-25, 43:21-22.) The Court acknowledges that, given the Debtor's age, she may have difficulty finding employment in today's challenging job market. However, by returning to graduate school when she was in her forties and voluntarily assuming the debt to finance her education, the Debtor must have believed that she had future earnings potential. *See Goulet,* 284 F.3d at 779; *see also O'Hearn,* 339 F.3d at 566 n.6. In fact, the Seventh Circuit applied this very reasoning in rejecting age as an outcome-determinative factor in evaluating the second *Brunner* prong. *Id.*

Next, the Debtor claims that her inability to communicate is keeping her from finding full-time work. Specifically, the Debtor testified that English is not her first language and that she has a "very limited vocabulary." (Trial Tr. 15:15-21, 37:2-3.) In that regard, the Debtor testified at trial about her experience on an interview for a pharmacy technician job. According to the Debtor, when she said good morning to the human resources director, his response was, "Oh, I like your accent. Where are you from?" (Trial Tr. 40:15-22.) Although the Debtor understood the exchange as a negative one, the Court cannot discern, without more, whether the interviewer disapproved of the Debtor's accent or whether he was searching for commonalities or simply making conversation. In any event, the Court had no trouble understanding what the Debtor said at trial, and, based on the evidence, her alleged inability to communicate does not constitute an insurmountable circumstance satisfying the "certainty of hopelessness" requirement.

As to her contention that her personality hinders her from finding employment, the Debtor stated that she has always had an argumentative and analytical personality, making it difficult for her

11

to work with others as a team in any job environment. (Trial Tr. 42:8-11, 46:22-47:1, 114:6-13.) The Debtor testified that in 2002, in response to her personality issues, her doctor prescribed an antidepressant medication, which she apparently used for a period of time but then decided to stop taking. (Trial Tr. 47:5-13, 48:8-14.) Other than that scant testimony, the Debtor simply presented no evidence as to any true physical or mental disability that is likely to impair her future employment prospects. *See Vargas v. Educ. Credit Mgmt. Corp. (In re Vargas)*, Bankr. No. 08-82824, Adv. No. 08-8135, Civ. No. 10-4022, 2010 WL 5395142, at *5 (C.D. Ill. Dec. 22, 2010) (noting that a debtor must precisely identify her problems and explain how her condition will impair her ability to work in the future in order to demonstrate that her state of affairs is likely to persist). Indeed, in response to opposing counsel's question about her "personality disorder," the Debtor said that she would not "call it [a] disorder" and that she is, in fact, "normal." (Trial Tr. 89:18-21, 113:21-24). As for physical conditions, the Debtor testified that she has "some arthritis," as well as limited motion in her left hand as a result of damage sustained to her plexus when she was born. (Trial Tr. 54:11-22.) According to the Debtor, she also had breast cancer in 2007, and there is "something wrong" with her liver. (Trial Tr. 54:3-11.) However, other than merely mentioning that she could not perform work involving the assembly of parts because of the limited motion in her hand (Trial Tr. 55:13-16), the Debtor failed to present any testimony or other evidence indicating that any of her physical impairments will prohibit her from obtaining employment in the future.

Finally, the Debtor claims that she will not be able to find a full-time job—and thus repay her student loans—because employers do not find her likable, primarily because of her combative personality. (Trial Tr. 40:2-22, 42:8-9.) According to the Debtor, potential employers do not care that she is hardworking and knowledgeable. Rather, their concern is only whether she is likable and

able to work as part of a team. (Trial Tr. 40:2-11.) Moreover, the Debtor contends that she is not able to secure even an entry-level position because she has been terminated from jobs in the past and, thus, has no one she can use as a professional reference. (Trial Tr. 43:15-25.)

While the Court sympathizes with the Debtor, her contentions merely reflect frustration and disappointment with her experiences in what is undeniably a very difficult job market. Moreover, despite her claim that she cannot find a job because she is unlikable, the Debtor's considerable work history indicates that she has been successful at securing employment in the past, even though she has always had an argumentative personality. As for her assertion that termination from previous jobs inhibits her ability to get work, the Debtor was able to secure a number of jobs following her work as a certified pharmacy technician instructor, even though her employment in that capacity was ultimately terminated by Corinthian Colleges. In fact, the Debtor currently has a childcare job which she has held since 2013 and from which she has not been terminated, although she performs that job on only a part-time basis.

As to the present and the future, the Debtor has offered no hard evidence to establish either that she is now conducting a truly diligent and sustained job search or that her inability to find full-time employment in the future is likely to persist indefinitely. Other than producing a blank application form from Bed Bath & Beyond (Debtor Ex. No. 9), the Debtor presented little evidence as to her current job search. She stated that she submitted her resume primarily online but did not know the names of the companies to which she applied. (Trial Tr. 51:8-15, 116:22-117:2.) When pressed, she was able to identify only a few establishments to which she had sent a resume, including Neiman Marcus, Sears, Kohls, the Citadel, Home Depot, Aldi, and Home Instead (a home healthcare establishment). (Trial Tr. 41:5-7, 49:3-18, 117:12-15, 118:9.) She also stated that she has an

account with and is looking for employment through the Illinois Department of Employment Services. (Trial Tr. 118:11-21.) Despite this testimony, the Debtor offered little or no information as to the details of the jobs, the positions to which she had applied, the requirements of the jobs, or the results of her application submissions. Moreover, although she acknowledges that she is argumentative and works best independently, rather than as part of a team (Trial Tr. 42:8-11, 46:22-47:1, 114:6-13, 119:4-9, 134:3-18), the Debtor has curiously limited her search for employment to positions requiring a great deal of customer service and interaction with people. She has even *created* obstacles to finding employment by selling her car and, more significantly, cancelling her Internet service. And while she contends that she is currently looking for work, the Debtor steadfastly maintains that she lacks marketable job skills and questions why she should even try to find a job when she does not "have a prayer." (Trial Tr. 39:12-16, 116:19-21, 129:7-10.)

In sum, while it is readily conceivable that the Debtor does, indeed, suffer from an impairment that hampers her ability to find and maintain certain kinds of employment and it is wholly possible that she conducted–and continues to conduct–an extensive search for employment, the Debtor presented little to no evidence of either such an impairment or such a job search. Accordingly, the Court simply cannot find that the Debtor has met her burden of proving by a preponderance of the evidence that additional circumstances exist indicating that her state of affairs is likely to persist for the remainder of the repayment period, and, thus, the Debtor has failed to establish the second prong of the *Brunner* test.

Finally, the third prong requires the Court to examine whether the Debtor has made a good-faith effort to repay the outstanding loans. "With the receipt of a government-guaranteed education, [the Debtor] assumes an obligation to make a good faith effort to repay those loans, as measured by

. . . her efforts to obtain employment, maximize income, and minimize expenses." *See Roberson,* 999 F.2d at 1136. In determining good faith, the Court must also inquire into whether the Debtor was negligent or irresponsible in conducting her financial affairs such that her misfortune is self-imposed. *See id.*

Here, there is no evidence that the Debtor was either negligent or irresponsible with respect to her finances. She testified that she tried to minimize expenses, took steps to consolidate her student loans, and sought both deferments and forbearances. And although she made merely five involuntary payments on the ISAC loans totaling $211.54 and paid ECMC only $46.43, the Debtor was not required to have paid a certain percentage or minimum amount of the loans in order to demonstrate good faith. *See Clark,* 341 B.R. at 255. However, despite the Debtor's attempts to address and repay the loans, there is little evidence of significant efforts to obtain appropriate employment or any effort to apply available income to the student loan debt. Moreover, while the Debtor's refusal to participate in an income-contingent repayment program does not preclude the Court from finding good faith, *see Krieger,* 713 F.3d at 884, the evidence suggests that the Debtor adamantly declined to consider any other relief or alternative to discharge of her student loans in bankruptcy, before or after her requests for deferment and forbearance had been denied.

Although there is evidence both in favor of and against a good-faith finding, the Court need not resolve the question, given its conclusion that the Debtor has not established that her financial condition is likely to continue over an extended period of time as required by the second prong of the *Brunner* test. *See Goulet,* 284 F.3d at 777; *Barker,* 2008 WL 754095, at *8. Rather, after careful consideration of the pleadings, the testimony at trial, the arguments of counsel, and applicable law, the Court finds that the Debtor has failed to demonstrate that her present inability to meet her

financial commitments is not likely to persist for a significant portion of the repayment period, as she has not established a certainty of hopelessness. Thus, the Debtor has failed to demonstrate that repayment of her student loans constitutes an undue hardship, and the Court holds that those loans are not dischargeable under § 523(a)(8).

## CONCLUSION

For the foregoing reasons, the Court finds in favor of the Defendants and against the Debtor and holds that the Debtor's student loan debt is nondischargeable under § 523(a)(8). A separate order will be entered consistent with this Memorandum Opinion.

**Dated:** September 30, 2014

**ENTERED:**

JANET S. BAER
United States Bankruptcy Judge